**Opinion issued August 26, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00572-CV

———————————

**CARMEN ALEMAN, ERIC B. DICK, AND THE DICK LAW FIRM, PLLC,**
**Appellants**

**V.**

**STANDARD CASUALTY COMPANY,**
**Appellee**

---

**On Appeal from the County Civil Court at Law No. 3**
**Harris County, Texas**
**Trial Court Case No. 1188597**

---

## MEMORANDUM OPINION

Appellants, Carmen Aleman, Eric B. Dick, and the Dick Law Firm, PLLC (the "Dick Law Firm") (collectively, "appellants"), challenge the trial court's rendition of summary judgment and award of sanctions in favor of appellee,

Standard Casualty Company ("Standard"), in Aleman's suit against Standard for breach of contract, breach of the duty of good faith and fair dealing, fraud, and violations of the Texas Deceptive Trade Practices Act ("DPTA") and the Texas Insurance Code. In three issues, appellants contend that the trial court erred in granting summary judgment, sanctioning appellants, and awarding Standard attorney's fees.

We affirm in part and reverse and remand in part.

## Background

In her first amended petition, Aleman alleged that she owned a residential property in Katy, Texas (the "property") that was insured by Standard from December 12, 2019 to December 12, 2020. According to Aleman, on or about October 23, 2020, the property was damaged "as a result of a wind and hail storm." Aleman submitted a claim to Standard for the damage caused on October 23, 2020, estimating $67,851.78 as the amount of damage to the property. Aleman alleged that Standard refused to pay her the "full" amount she was owed under her policy.

Aleman brought claims against Standard for breach of contract, breach of the duty of good faith and fair dealing, fraud, and violations of the DPTA[1] and the Texas Insurance Code. Aleman sought damages and attorney's fees.

---

[1] *See* TEX. BUS. & COM. CODE ANN. §§ 17.01–.955.

Standard answered, generally denying the allegations in Aleman's petition and asserting that Aleman "ha[d] not presented a covered loss for . . . damage that occurred within the policy period" and Standard had already paid for Aleman's "separate claim for wind damage to [the property's] roof."

Standard then moved for summary judgment on Aleman's claims against it. Standard asserted that it was entitled to judgment as a matter of law on Aleman's claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code and there was no evidence to show that Standard breached the duty of good faith and fair dealing, violated the DTPA, or committed fraud. In its motion, Standard explained that on February 9, 2021, Aleman presented "a claim to Standard for a loss occurring on or about October 23, 2020 for damage to the [p]roperty allegedly from hail." The property was then inspected on February 11, 2021.

The insurance adjuster who inspected the property "found no evidence of hail or wind damage to the roof or exterior" of the property. The adjuster also "found no evidence of wind damage to [Aleman's] fence or gazebo and no evidence of any covered loss for the various damages found on the interior of the home." According to the adjuster, the property had "rotted decking on the roof's right slope," "missing shingles on the right and left front gable," "left-rear hip on [the] right slope," and "missing shingles on a portion of the ridge showing weathered exposed decking."

3

The damage was found to be preexisting and "not caused by a named peril" under Aleman's policy. The adjuster's interior inspection found "damage in the game room right below the damaged ridge on the roof as well as in the hall bathroom ceiling." Because such damage had "resulted from a repeated event," it was not covered by Aleman's policy. According to the adjuster, any damage "to the downspouts and the fence post [was] not caused by hail or any covered event." Although there was "hail damage to some window beading, weather reports clearly demonstrated that no hail [had] occurred on or near the [p]roperty during the [p]olicy period." On February 24, 2021, Standard notified Aleman by letter that her claim related to the purported October 23, 2020 weather event was not covered by her policy.

In the matter-of-law portion of its summary-judgment motion, Standard argued that Aleman could not recover on her breach-of-contract claim as a matter of law because Aleman could not establish that she suffered hail damage to the property and that "the cost for repairs of the purported hail damage [was] in excess of her deductible." Standard also could not breach its insurance policy with Aleman if Aleman did not have damages to the property that were covered by her policy. Further, Standard explained that Aleman could not recover for violations of the Texas Insurance Code under chapters 541 and 542 because if Standard did not breach the insurance policy, then it could not have violated the "unfair practices" provisions

4

of the Texas Insurance Code. Aleman could also not establish that Standard acted in bad faith in handling her claim.

As to Aleman's claim for breach of the duty of good faith and fair dealing, Standard argued that it was entitled to judgment as a matter of law on that claim because "[t]he undisputed evidence establishe[d] that Standard acted reasonably in denying [Aleman's] hail claim and . . . there was a bona fide dispute as to whether the [p]roperty suffered hail damage in excess of [Aleman's] deductible." An insurer breaches the duty of good faith and fair dealing "by denying or delaying payment of a claim" when it "knew or should have known it was reasonably clear the claim was covered," and, here, Aleman could not establish that Standard had acted in bad faith. (Internal quotations omitted.)

In the no-evidence portion of its summary-judgment motion, Standard argued that Aleman could not recover on her claim for breach of the duty of good faith and fair dealing because Aleman had no evidence that Standard breached its duty. As to Aleman's claim for violations of the DTPA, Standard asserted that Aleman had no evidence that Standard represented that any goods or services had characteristics, benefits or qualities that they did not have, Standard represented that Aleman's policy conferred rights and remedies that it did not, Standard failed to disclose information concerning Aleman's policy that was known at the time of purchase and the failure to disclose was intended to induce Aleman into a transaction which she

5

would not have otherwise entered, Standard engaged in unconscionable conduct, and that any act by Standard proximately caused Aleman damages. And as to Aleman's fraud claim, Standard asserted that Aleman had no evidence that Standard operated in reckless disregard for Aleman in the course of handling her claim, made false statements, misrepresented material facts, engaged in fraudulent acts for the purpose of misleading Aleman as to actual damages resulting from the storm, had knowledge of any alleged false statements or made any statement recklessly without any knowledge of the truth and as a positive assertion, and made any misrepresentation that Aleman acted upon. Standard also asserted that Aleman had no evidence that she acted in reliance on any alleged misrepresentation or that she suffered any injury as a result of the alleged fraud.

Standard attached to its summary-judgment motion a copy of Aleman's policy for the property, which was effective from December 12, 2019 to December 12, 2020. The policy stated that it "insure[d] against physical loss to the property" caused by a "[w]indstorm, [h]urricane and [h]ail."

Standard also attached to its motion the affidavit of Rebecca Renee Johnson, the assistant claims manager for Standard. In her affidavit, Johnson testified that Aleman, on February 9, 2021, notified Standard of a claim for hail and wind damage at the property that occurred on October 23, 2020. The property was inspected on February 11, 2021 by Christopher Ryan Strohl from Mason Claims Services. On

February 24, 2021, Standard notified Aleman that her claim was not covered by her policy because "none of the claimed damage was caused by a peril insured against in the [p]olicy."[2]  On February 7, 2022, Aleman submitted a claim under her policy

---

[2]  A copy of the February 24, 2021 letter from Standard to Aleman was attached to Johnson's affidavit.  It listed her claim number, the date of loss as October 23, 2020, and the cause of loss as "[h]ail."  In the letter, Standard stated:

> As you are aware, this office received notice on February 9th 2021, for hail damage to your roofing system on you [sic] home.  . . .
>
> Adjuster . . . Strohl's inspection . . . with you on February 11th 2021, revealed rotted decking on the roof's right slope; missing shingles on the right and left front gable; left-rear hip on [the] right slope; [and] missing shingles on a portion of the ridge showing weathered exposed decking.  This damage is preexisting and not caused by a named peril under your policy therefore, not covered.
>
> Additionally, the inspection revealed hail damage to the window beading.  Your . . . policy [was] in effect as of December 12th 2019 through December 12th 2020, which constitutes the time for which coverage will be afforded.  We have received the hail event report which concludes the hail which damaged your home occurred prior to your policy inception.  Therefore, there is no coverage for the hail damage prior to your policy incept[ion] date.
>
> The interior inspection revealed damage in the game room right below the damaged ridge on the roof as well as in the hall bathroom ceiling.  This is a repeated event, therefore not covered under your policy.
>
> During the inspection the adjuster noted damage to the downspouts and the fence post on the right elevation was leaning and not damaged due to any named peril under your policy.  No coverage applies.
>
>  . . . There is no coverage for the damages as reported.
>
> . . . .
>
> . . . [T]he purpose of this letter is to advise you that there is no coverage for the deteriorated roofing system, interior damage to ceilings, fencing and hail damage to window beading to your home.

for damage arising from a January 10, 2022 windstorm; Standard paid her based on that claim.[3]

Additionally, the unsworn declaration of Strohl was attached to Standard's summary-judgment motion. In the declaration, Strohl stated that he was employed by Mason Claim Services and was assigned to inspect the property after Aleman's claim "for a loss caused by . . . hail and wind on October 23, 2020." Strohl inspected the property on February 11, 2021, and he did not find "any damage caused by hail or wind to the roof or exterior of the [p]roperty." Strohl explained that he also "found no evidence of wind damage to [Aleman's] fence or gazebo[,] and further found no evidence of any covered loss for the various damages found on the interior of the home." Although his inspection of the property "revealed rotted decking on the roof's right slope; missing shingles on the right and left front gable; left-rear hip on [the] right slope; [and] missing shingles on a portion of the ridge showing weathered exposed decking," the damage was "preexisting and not caused by a named peril under [Aleman's] policy." Strohl also stated that his inspection of the interior of the home showed "damage in the game room right below the damaged ridge on the roof as well as in the hall bathroom ceiling." Damage on the property's downspouts and the fence post "were not caused by hail or any covered event." Finally, Strohl noted

---

[3]    A copy of a check from Standard to Aleman was attached to Johnson's affidavit.

that although he found "hail damage to some window beading," a hail report,[4] showed that "no hail occurred on or near the [p]roperty during the [p]olicy period" from December 12, 2019 to December 12, 2020.

Further, Standard attached to its summary-judgment motion a copy of the transcript from Aleman's deposition. In her deposition, Aleman testified that she owned the property, and she recalled calling Standard to make a claim. Aleman could not recall the weather event that purportedly occurred on October 23, 2020 that caused her to file her claim with Standard. She also could not recall what happened in February 2021 that caused her to think she had a claim for damage to the property. When asked if she remembered a storm happening around October 2020, Aleman responded, "Maybe."

According to Aleman, at some point, "someone . . . stop[ped] by to look at [the property] and there was some damage," but she did not remember who that "someone" was or what kind of damage he saw. Aleman, herself, had not seen damage to the property and did not know the cause of any damage.

---

[4]     A copy of the hail report was attached to Strohl's unsworn declaration. The report showed that no "significant hail event" occurred at the property on October 22, 2020 through October 24, 2020, and "[h]ail greater than 0.75[] [inches] did not occur" at the property on October 23, 2020. Further, the last time that there was hail measuring 0.75 inches in diameter was on August 27, 2019, 423 days before the reported date of loss. The estimated wind speed on those days was thirty-five miles per hour.

She had not hired anyone to do repairs on the property. From the time that Aleman had lived at the property, she had not had the roof repaired. While looking at photographs of the property during her deposition, she did not know when the damage to her roof had occurred. She did not know when shingles had gone missing from the roof, and she did not remember any water entering the home. She also did not know that "there were rugs being used to patch [the] roof." She was not told that hail or wind had caused the rotting wood outside the game room window of the home. Aleman did not know what caused any of the damage found by the adjuster who inspected the property in February 2021. No one had ever told her that the interior damage to the home was caused by hail or wind.

Aleman also testified that her attorney had hired a company to inspect the property in August 2021, but she did not recall if anyone from the company told her what had caused the damage to the property. Between October 2020 and August 2021, Aleman had repaired "some shingles" on the roof, but she did not know where on the roof the shingles were replaced. This would have happened after she filed her February 2021 claim with Standard, and she did it because water was coming into the upstairs of the home.

Finally, Aleman testified that she made a second claim with Standard for a wind event that occurred on January 10, 2022. She stated that she thought a storm, or some wind had occurred, but she could not remember exactly what had happened

10

weather wise. She recalled finding shingles on the ground though. Standard sent her a check in response to her second claim. Aleman could not remember if her second claim involved damage to the interior of the home as well.

Standard also attached to its summary-judgment motion a copy of the transcript from Billy Bray's deposition testimony. In his deposition, Bray testified that he owned a commercial insurance brokerage, and he had been contacted about Aleman's case in January 2023 by her attorney. He had never spoken to Aleman, and he had not inspected the property. He was not told that he had been designated as an expert witness by Aleman, and he had not been told whether he was going to testify in the case. In preparation for his deposition, Bray had reviewed Aleman's policy, "the dispute," and other files sent to him by Aleman's attorney. He had not been asked to produce a report by anyone. He was available to answer "coverage questions" about whether Aleman's claim was covered by her policy. Bray stated that he "believe[d] there[] [was] coverage for the claim based on the policy language."

Bray further testified that he "believe[d] [Aleman's] claim was a wind or hail or maybe [a] wind and hail claim" and "[i]t look[ed] like the damage was caused by wind, hail or a combination of the two." Bray did not get on the property's roof and observe the damage personally though. He also could not say when the damage to the property's roof had occurred, and he was not sure if a weather event had occurred

11

in the timeframe listed in Aleman's claim or during Aleman's policy period. Further, he noted that it was possible that something other than wind or hail had led to the damage to the interior of the home; he believed the damage to the interior of the home was caused by water. He did not know when the damage to the interior of the home had occurred. Bray did not believe that Standard had acted in bad faith, but he also stated that he was not asked to testify as to bad faith.

A copy of the transcript from the deposition of Richard Gadrow was attached to Standard's summary-judgment motion. Gadrow testified that he was contacted by Aleman's attorney, but he had not been asked to serve as an expert witness in the case, and he had never been told that he was designated as one. Gadrow owned Quantum Claim Consulting Services, and he "d[id] inspections and estimates on storm damage and insurance claims" for both residential and commercial properties. Gadrow inspected the property in 2021 and wrote an estimate for the cost of repairs to the property. He could not remember ever speaking to Aleman.

Gadrow further testified that he had concluded that there was damage to the property, and he believed the damage to the property was due to "the freeze," but he could not recall when "the freeze" had occurred. He also stated that he could not say "exactly what [had] happened"; it was just his "best guess." While viewing photographs that he took during his inspection, Gadrow acknowledged that he could

12

not determine what caused certain damage to the property's roof or when that damage had occurred.

He noted that he believed that the water damage to the ceiling and wall inside the home was caused by ice damming on the roof, which led to water leaking inside. As to other damage inside the home, Gadrow opined that it "could be a leaking pipe" or it "could be a leak from the roof dripping off of a rafter," but there was "a number of different ways that [the damage] c[ould have] happen[ed]." He did not reach a conclusion as to what caused the damage inside Aleman's home. He also did not know when the damage had occurred. While investigating both the outside and inside damage to the property, Gadrow did not see any damage that was the result of hail.

According to Gadrow, he intended to testify at trial that there was $67,851 in damage to the property because that was what he estimated it would be the cost to repair the property. A copy of Gadrow's estimate was attached as an exhibit to his deposition transcript. The estimate stated that it was "based upon a visual inspection of the . . . property conducted in August of 2021," and it would cost $37,124.53 to repair the roof, $8,304.21 to repair the exterior, $3,370.68 to repair the "[l]oft," $1,079.12 to repair the stairway, $3,159.81 to repair the hallway, and $2,156.06 to repair a bedroom. It also included $12,657.37 for other "[g]eneral" repair costs.

Further, Standard attached a copy of the transcript from Matthew Morgan's deposition to its summary-judgment motion.[5] Morgan testified that he was a licensed insurance adjuster that had been contacted by Aleman's attorney. He reviewed Gadrow's estimate, and the photographs attached to it, and he concluded that there was damage to the property because there were missing shingles on the roof. He believed the damage to the roof was caused by wind. He also used certain software and found that there were two wind events in September and October 2021.[6] Morgan did not look for hail damage to the property when he reviewed Gadrow's estimate and photographs.

Morgan had no information to show that Standard was trying to avoid paying Aleman's claim, and he did not have any information regarding Standard's overall handling of Aleman's claim. Despite this limited knowledge, he stated that he believed that Standard had acted in bad faith because Standard did not pay Aleman's claim. Morgan noted that he had never been to the property, and he had never spoken to Aleman.

A copy of the transcript from Shiran Renga Perera's deposition was attached to Standard's summary-judgment motion. Perera testified that he had been contacted

---

[5] A copy of an email sent from Morgan to Standard's counsel, which was also attached to the summary-judgment motion, stated that he was an "unretained expert."

[6] In her petition, Aleman alleged that the property was damaged on October 23, 2020.

14

a few weeks before her deposition by Aleman's attorney, who told him that he was designated as an expert witness in the case. Perera was employed as a civil and structural engineer. Perera intended to testify about the cause of damage to the property and not about whether the damage was covered by Aleman's policy. Perera did not inspect the property, but reviewed Gadrow's estimate. He had never spoken to Aleman.

After reviewing Gadrow's estimate, Perera understood that mainly wind damage had occurred to the property. The photographs attached to the estimate showed wind damage but not hail damage. He noted that the photographs were taken in August 2021, even though the damage to the property reportedly occurred in October 2020. He could not tell from the photographs when any damage to the property had occurred, and he noted that he did not see hail damage in the photographs. At least one of the photographs revealed what he believed to be damage from a tree rubbing against the roof. He thought some damage he observed in the photographs could have been caused by wind along with temperature changes, and some was caused by only wind.

While viewing photographs of the fence on the property, Perera opined that the damage was caused by wind. As to the interior of the home, Perera stated that the photographs showed water intrusion from a leak. He did not see any damage to the attic in the photographs.

15

In her response to the matter-of-law portion of Standard's summary-judgment motion, Aleman argued that Standard was not entitled to judgment as a matter of law on her breach-of-contract claim because Standard "failed and refused to pay adequate compensation for [Aleman's] claim" and there was a fact issue as to whether the damage to the property was covered by Aleman's policy. As to her claims for violations of the Texas Insurance Code, Aleman argued that Standard was not entitled to judgment as a matter of law because they remained viable, and Standard had engaged in bad faith in handling Aleman's claim. For instance, according to Aleman, Standard had "failed to perform a reasonable investigation of [the] property" because Aleman's investigator's repair estimate was larger than Standard's adjuster's estimate. Further, Aleman asserted that there was a fact issue as to whether Standard had engaged in unfair settlement practice because the evidence showed that Standard did not conduct an accurate evaluation of Aleman's damages, did not conduct a reasonable investigation or provide a reasonable explanation for its failure to pay Aleman under her policy, did not provide a timely indication of acceptance or rejection, and did not timely compensate Aleman for her losses. As to her claim for breach of the duty of good faith and fair dealing, Aleman argued that Standard was not entitled to judgment as a matter of law because Standard "unquestionably owed [Aleman] a duty of good faith and fair dealing."

16

In her response to the no-evidence portion of Standard's summary-judgment motion, Aleman argued that there was "ample evidence" that Standard had violated the DTPA because the same violations of the Texas Insurance Code constituted violations of the DTPA. Aleman also asserted that there was a fact issue as to whether Standard "knowingly made a false, material representation upon which [Aleman] was intended to rely and [Aleman] actually relied and suffered injury," so summary judgment was improper on her fraud claim.

Aleman attached her own affidavit to her response as well as a copy of her policy with Standard and a copy of Gadrow's repair estimate along with his business record affidavit.

In its reply to Aleman's summary-judgment response, Standard objected to Aleman's summary-judgment evidence, and it requested that those documents be struck. Standard also asserted that Aleman had failed to raise a fact issue as to whether she suffered a covered loss during her policy period, and without a covered loss, Aleman could not recover of on her claims for breach of contract, violations of the Texas Insurance Code, breach of the duty of good faith and fair dealing, and bad faith. Further, Standard asserted that Aleman, in her response, failed to cite any evidence "to identify a single act or omission that constitute[d] a deceptive act or that constitute[d] fraud."

The trial court sustained Standard's objections to Aleman's summary-judgment evidence and struck Aleman's affidavit and Gadrow's repair estimate and affidavit from the summary-judgment record. The trial court also granted Standard's matter-of-law and no-evidence summary-judgment motion on Aleman's claims against it and ordered that she take nothing on her claims against Standard.

In connection with its summary-judgment motion, Standard also moved to recover attorney's fees under the Texas Rules of Civil Procedure, the Texas Insurance Code, the Texas Civil Practice and Remedies Code, and the DTPA,[7] asserting that Aleman had filed a frivolous lawsuit, which was sanctionable conduct. According to Standard, Aleman's claims against it were "wholly without basis in law or fact" at the time she filed her petition. Neither Aleman nor her attorney "had made [a] reasonable inquiry to determine if the claims [alleged against Standard] were supported by facts or law," "had investigated or obtained any analysis regarding causation of the alleged damages" to the property, or "had retained any experts to review or analyze the cause of damage to [the] [p]roperty in order to ascertain if the cause of such damage would fall within the categories of 'covered peril' under [Aleman's] policy." (Emphasis omitted.) Further, Aleman testified in

---

[7] *See* TEX. R. CIV. P. 13; TEX. INS. CODE ANN. § 541.153; TEX. CIV. PRAC. & REM. CODE ANN. § 10.001; TEX. BUS. & COM. CODE ANN. § 17.50(c).

18

her own deposition that she "had no knowledge of the cause of the damage to [the property], she had not been told that any damage to [the property] was caused by wind or a hailstorm," and she had no knowledge or expertise "to be able to evaluate the type or cause of damage to [the property]." Standard also asserted that Aleman had filed a false, groundless, and misleading designation of expert witnesses along with her petition to "make it appear that [she] had retained multiple experts." But at the time the designation was filed "none of the designated experts [had been] told or [were] aware they had been designated as expert witnesses" and "none of the designated experts who [were] deposed ha[d] reviewed or approved the [d]esignation prior to the time [it] was filed." (Emphasis omitted.) Standard attached attorney's fees evidence to its motion.

In response to Standard's motion for attorney's fees, Aleman asserted that her claims against Standard were not frivolous, and she had based her suit on "findings [from] expert reports," referring to Gadrow's repair estimate.

The trial court granted Standard's request for attorney's fees pursuant to Texas Insurance Code section 541.153, Texas Rule of Civil Procedure 13, Texas Civil Practice and Remedies Code section 10.001, and Texas Business and Commerce Code section 17.50(c). Aleman then requested a jury trial on the issue of reasonableness and necessity of Standard's attorney's fees under Texas Insurance Code section 541.153, Texas Rule of Civil Procedure 13, Texas Civil Practice and

19

Remedies Code section 10.001, and Texas Business and Commerce Code section 17.50(c), which the trial court granted.

Following the admission of evidence at trial, the jury found, as to the amount of reasonable and necessary attorney's fees, that Standard was entitled to recover $137,000 for representation in the trial court, $16,250 for representation in the court of appeals, $10,000 for representation at the petition for review stage in the Texas Supreme Court, $10,000 for representation at the briefing on the merits stage in the Texas Supreme Court, and $12,000 for representation at the oral argument stage and through the completion of the proceedings in the Texas Supreme Court.

In its final judgment, the trial court sustained Standard's objections to Aleman's summary-judgment evidence and struck the objected-to evidence attached to Aleman's summary-judgment response. The trial court also granted Standard summary judgment on Aleman's claims against it and ordered that she take nothing on her claims against Standard. Further, the trial court granted Standard's request for attorney's fees pursuant to Texas Insurance Code section 541.153, Texas Rule of Civil Procedure 13, Texas Civil Practice and Remedies Code section 10.001, and Texas Business and Commerce Code section 17.50(c). Consistent with the jury's verdict, the trial court awarded Standard $137,000 in attorney's fees as sanctions against Aleman and her attorney as well as unconditional appellate attorney's fees.

20

Related to its award of attorney's fees, the trial court made the following findings of fact:

1.  [Aleman] failed to present any admissible evidence to contradict [Standard's] Traditional and No-Evidence Motion[] for Summary Judgment pursuant to Texas Rules of Civil Procedure 166a and 166a(i):

    a.  [Aleman] and her counsel did not present admissible evidence of coverage under any insurance policy and failed to identify a loss occurring within the applicable policy period that was covered under the policy.

    b.  [Aleman] and her counsel failed to establish with any admissible evidence that [she] suffered any damages for which Standard could be held liable.

    c.  [Aleman] and her counsel did not present admissible evidence of any act or omission constituting a breach of any policy contract issued by Standard, including evidence of a covered peril occurring within the policy period.

    d.  [Aleman] and her counsel did not present admissible evidence segregating covered losses from those specifically excluded by the applicable insurance policy for any loss suffered.

    e.  In [her] response to the Motion[] for Summary Judgment, [Aleman] and her counsel failed to establish that Standard (1) violated the policy contract or any provision of the Texas Insurance Code; (2) committed any act or omission constituting bad faith; (3) failed to act in good faith and fair dealing; or (4) engaged in fraud or a breach of the [DTPA].

2.  [Aleman's] Response to Standard's Motion[] for Summary Judgment and Motion for Recovery of Attorney's Fees and Costs as described above demonstrate[s] that the lawsuit is groundless, brought in bad faith, and could only have been brought for the

21

purpose of harassment. [Aleman's] Response demonstrates that the pleadings filed by [Aleman] lacked any reasonable basis in law or fact; that the pleadings were signed by counsel without any inquiry and without knowledge of viable claims; and that counsel knew or should have known the allegations were groundless.

3.    [Aleman's] pleadings and responses demonstrate that neither [Aleman] nor her counsel had any evidence of coverage, acts violating any provision of the Texas Insurance Code, any act constituting bad faith or the failure to act in good faith and to deal fairly with its insured, fraud, or a violation of the [DTPA] when this lawsuit was filed.

4.    Due to [Aleman] and her counsel's failure to support by any claim pled in this lawsuit and the failure to identify any effort to investigate a basis in law or fact to support the[] pleadings, the [c]ourt finds that there is no evidentiary support for any claim pled by [Aleman] in this lawsuit and that the lawsuit was brought for an improper purpose, including to cause unnecessary delay and the needless increase of the cost of litigation.

5.    With regard to the following of [Aleman's] designated experts, the [c]ourt further finds that the Expert Designations filed by [Aleman] and her attorneys, . . . Dick and the Dick Law Firm, . . . were misleading and contained false information about designated witnesses. . . . Dick and the Dick Law Firm . . . obstructed the discovery process by filing designations that were not reviewed or approved by the named witnesses and did not accurately represent the views or opinions of the identified witnesses. [Aleman's] expert designations stated false opinions that were not actually held by the identified witnesses:

   a.    Richard Gadrow:

         i.    Gadrow was designated as a "General Contractor/Estimator" to testify "about the nature, existence of damage, loss cause . . . and value of [Aleman's] property and similar property."

22

ii.     [T]he [Expert] Designation further identifies the following expected opinions for Gadrow:

   A.     " . . . [A]n insurance carrier adjusting this claim reasonably and in good faith either knew or should have known to identify and accept coverage for the aforementioned reasonably clear damages";

   B.     "[T]o the extend [sic] [Standard] failed to acknowledge and accept coverage for the aforementioned reasonably clear damage, [Standard] adjusted this claim in bad faith";

   C.     "[Standard] did not fully indemnify the insured for his/her loss and he/she has not been paid to restore the insured's property back to pre-loss condition"; and

   D.     "[T]he insured was underpaid for this claim and [Standard] knew or should have known that its claim decision constituted an unfair denial because evidence of covered damages warranting further coverage at all times was reasonably clear during its claim investigation[.]"

iii.    Gadrow was deposed on January 19, 2023. He testified that he did not recall being approached by [Aleman's] counsel to be an expert and could only recall inspecting the [p]roperty "sometime in 2021." He had not seen the Expert Designation attributable to him, did not approve of it before it was filed in this case, was not informed that it was being submitted on his behalf, or that he was being designated as an expert. He was first informed that he was designated an expert a few weeks before his January 19th deposition.

23

iv.     He inspected the [p]roperty and prepared a single damage estimate using Xactimate, which contained detailed information regarding the damaged items and estimated costs of repair but was wholly devoid of any analysis as to the cause or type of damage and did not address causation. Rather[,] the estimate contains a single remark related to causation which was not a conclusion or opinion of Gadrow, but merely a statement that he was contracted to provide a "disinterested third party estimate for the repairs to the subject property caused by a covered peril as defined by Others[.]"

v.      Gadrow testified that he would not be testifying whether or not the damage was covered under the policy, and his sole report (an Xactimate estimate) contains no analysis of policy coverage.

vi.     . . . Gadrow merely inspected the damage and prepared a repair estimate, but he did not find that [Aleman's] roof exhibited damage caused by hail, rather he found it was caused by "the freeze" and "ice damming" and also stated that wind was a possible cause of some of the damage, and that there was nothing he could rely on to tell the date of damage.

vii.    Gadrow did not calculate any percentage of the roof damaged by the ice storm versus wind damage, and did not recall any damage caused by hail, nor conclude that any damage was caused by hail based on review of his report photos during his deposition. He did not state in his report on which elevations he saw any alleged ice or wind damage. He further admits he cannot tell when the damage occurred and stated there is nothing he could rely on that shows when the damage occurred.

24

b.  Billy Bray:

    i.  [Aleman] designated Bray to opine as to the following:

        A.  [T]he insured sustained covered loss during the effective policy period.

        B.  The proper scope of repairs to address the damages is reflected in the estimates or appraisal awards previously produced or to be produced.

        C.  Evidence of covered damage was obvious and reasonably clear.

        D.  An insurance carrier adjusting this claim reasonably and in good faith either knew or should have known to identify and accept coverage for the reasonably clear damages.

        E.  To the extent [Standard] failed to acknowledge and accept coverage for the reasonably clear damage, [Standard] adjusted this claim in bad faith.

        F.  [Standard] did not fully indemnify the insured for his/her loss and he/she has not been paid to restore the insured's property back to pre-loss condition.

        G.  The insured was underpaid for this claim and [Standard] knew or should have known that its claim decision constituted an unfair denial because evidence of covered damages warranting further coverage at all times was reasonably clear during its claim investigation.

25

ii. [Aleman's] counsel initially agreed to a date for Bray's deposition and the deposition was scheduled for January 17, 2023. [Aleman's] counsel informed Standard's counsel the day before that the deposition had to be rescheduled. . . . Bray's deposition was eventually taken on January 26, 2023.

iii. When deposed, . . . Bray admitted he was first contacted by [Aleman's] counsel in January of 2023, and had never spoken with [Aleman].

iv. Bray testified that he would not be testifying as to bad faith and had no basis to believe bad faith occurred.

v. Bray did not inspect the [p]roperty, has not been asked to prepare a report, and he did not review or approve the [Expert] Designation prior to the date it was filed.

c. Matt Morgan:

i. [Aleman's] Expert Designation states that Morgan is expected to opine to the following opinions:

A. He may be called to testify as an insurance professional with regard to what a reasonable and prudent insurance adjuster and/or insurance company would have done in processing the insurance claim subject to this lawsuit.

B. He is expected to testify regarding his investigation and [Standard's] handling of the claim and that [Standard] did not exercise good faith while adjusting [Aleman's] claim.

C. He is designated to testify that he would testify as insurance professional and "legal

expert" with regard to what constitutes a valid defense of fraud. More specifically, he will testify that the [Standard] would be incorrect in claiming fraud because there is a lack of materiality and/or there is no material evidence showing intent to deceive on behalf of the insured. . . .

ii.    This deposition was unnecessarily difficult to schedule. [Aleman's] counsel initially agreed to a date, and the deposition was scheduled for January 10, 2023. Counsel apparently never informed Morgan about the deposition and Standard was forced to serve a Notice of Deposition and a subpoena to compel Morgan to appear. After Morgan was served, he contacted Standard's counsel, asking to be paid, and stated that [Aleman's] counsel had never contacted him. Indeed, his first knowledge of this case was when Standard's counsel contacted him.

iii.   Morgan's deposition was rescheduled twice, first from January 10, 2023 to February 15, 2023, and then rescheduled again to February 21, 2023, and his deposition was ultimately taken on February 21, 2023.

iv.    Morgan did not inspect the [p]roperty and had not spoken to the [Aleman] at the time of the deposition. He did not contribute at all to the Expert Designation attributable to him. Despite being designated to testify to "[Standard's] handling of the claim and that [Standard] did not exercise good faith while adjusting [Aleman's] claim," he was not even given the claim file to review.

v.     Contrary to [Aleman's] claim that her [p]roperty was damaged by hail, Morgan concluded the damage was caused primarily by a wind event, and

27

he had no basis to conclude there was any other cause.

    d.    Shiran Perera:

        i.    [Perera] was designated to testify "regarding the causation, nature, existence of damage at the insured property" and "an event (ie: hail, wind, fire, pipe burst, freeze, water loss, etc) occurred at the insured location during the policy period and said event caused damaged [sic] to the insured property."

        ii.    Perera was first contacted by [Aleman's] counsel a few weeks before his January 11, 2023 [d]eposition. He did not inspect the [p]roperty, nor speak with anyone about the [p]roperty and the alleged damage. Perera testified only to wind damage, damage from a tree branch, and temperature changes (freezing and thawing).

        iii.    He did not see evidence of hail damage to the roof, including no hail damage to any of the metal vents. He could only testify from photographs taken in August 2021, even though the alleged hailstorm was stated as occurring in October 2020.

        iv.    He cannot determine when any of the damage he sees in the photograph occurred, other than to guess at the "last couple of years," and some of the damage was even older.

6.    . . . Dick and the Dick Law Firm . . . obstructed the discovery process by failing to timely tender each designated witness for deposition, forcing Standard to incur substantial expense in issuing and serving subpoenas, forcing Standard to incur cost to issue multiple deposition notices, and in having to depose each witness to discover the falsity of the designations. In addition to the findings discussed above in paragraph 5, [Aleman] and her counsel designated Dexter McIntrye as an "Appraiser," with a

nearly identical designation as Gadrow. There was no appraisal in this case. [Aleman] never made McIntyre available for deposition, forcing [Standard] to serve a Notice of Deposition and subpoena to compel him to appear. McIntyre was served and scheduled to appear for deposition on January 9, 2023. After McIntyre was served, he personally contacted Standard's counsel, asking to be paid, and stated that [Aleman's] counsel had never contacted nor retained him to serve as an expert. McIntyre's deposition was then scheduled for March 2, 2023, however [Aleman's] counsel cancelled and informed [Standard] that the deposition again needed to be rescheduled without providing any reason or explanation. . . . McIntyre was never presented for deposition.

7.     [Aleman] and her counsel . . . Dick and the Dick Law Firm . . . were provided the opportunity to respond to the Motion for Recovery Fees and Costs, but failed to do so in any meaningful or substantive way. In response to the Motion for Recovery of Attorney's Fees and Costs, neither [Aleman] nor counsel responded with affidavit testimony or any evidence establishing that either had investigated the facts supporting the lawsuit, nor determined that the lawsuit was supported by any legal authority. The [c]ourt finds that [Aleman] and her counsel's failure to present evidence supporting the claims made in [Aleman's] [p]etition and the failure to identify any investigation or basis for any claim made in this proceeding when the suit was filed is evidence that the lawsuit, from its inception, was frivolous, groundless, and made solely for the purpose of harassment.

8.     [Standard] has suffered damages in the amount of $137,00.00 in attorney's fees as a result of the groundless and frivolous pleadings and expert designations filed in this lawsuit by . . . Aleman and her attorneys, . . . Dick and the Dick Law Firm . . . .

(Emphasis omitted.)

29

## Summary Judgment

In their first issue, appellants argue that the trial court erred in granting Standard summary judgment on Aleman's claims against it because "more than a scintilla of evidence exist[ed] raising genuine issues of material fact" and the trial court erred in striking Aleman's affidavit attached to her summary-judgment response.

A party seeking summary judgment may combine in a single motion a request for summary judgment under the no-evidence standard with a request for summary judgment as a matter of law. *Binur v. Jacobo*, 135 S.W.3d 646, 650–51 (Tex. 2004). We review a trial court's summary-judgment ruling de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

## A. Summary-Judgment Evidence

In a portion of appellants' first issue, they assert that the trial court erred in striking Aleman's affidavit attached to her summary-judgment response.

We review a trial court's decision to admit or exclude summary-judgment evidence for an abuse of discretion. *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017); *Holland v. Mem'l Hermann Health Sys.*, 570 S.W.3d 887, 893–94 (Tex. App.—Houston [1st Dist.] 2018, no pet.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002). We will not reverse a trial court's erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

In the trial court, Aleman attached her affidavit to her response to Standard's summary-judgment motion.[8] Standard then objected to and moved to strike Aleman's affidavit, asserting, among other things, that it contained inadmissible

---

[8] Aleman also attached a copy of her policy with Standard and a copy of Gadrow's repair estimate, along with Gadrow's accompanying affidavit. Standard moved to strike Gadrow's repair estimate and accompanying affidavit, which the trial court granted. Appellants do not appear to challenge that ruling on appeal, but to the extent that they do, for reasons discussed below, we hold that the complaint is waived due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i); *Trimcos, LLC v. Compass Bank*, 649 S.W.3d 907, 921 (Tex. App.—Houston [1st Dist.] 2022, pet. denied).

hearsay and inadmissible legal opinions and was nonsensical, confusing, conclusory, vague, lacked a proper foundation, lacked personal knowledge, and was irrelevant. The trial court sustained Standard's objections to Aleman's affidavit and struck it from the summary-judgment record.

On appeal, appellants' briefing contains only conclusory statements that "the trial court abused its discretion in striking Aleman's summary[-]judgment evidence." There is no substantive analysis or argument to support their assertion that the trial court erred in sustaining Standard's objections or in striking Aleman's affidavit. *See* TEX. R. APP. P. 38.1(i); *see also Bolanos v. Purple Goat, LLC*, 649 S.W.3d 753, 763 (Tex. App.—El Paso 2022, no pet.) ("It was [appellant's] burden to challenge on appeal each basis for the trial court's exclusion of evidence.").

Texas Rule of Appellate Procedure 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *See* TEX. R. APP. P. 38.1(i). A failure to provide substantive analysis of an issue or cite appropriate authority supporting a complaint waives the complaint on appeal. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also In re Estate of Taylor*, 305 S.W.3d 829, 836 (Tex.

App.—Texarkana 2010, no pet.) (failure to provide substantive analysis of issue presented results in waiver of complaint on appeal).

We hold that appellants waived, due to inadequate briefing, their complaint about the trial court's striking of Aleman's affidavit. *See, e.g.*, *Shaw v. Trinity Highway Prods., LLC*, 329 S.W.3d 914, 920 (Tex. App.—Dallas 2010, no pet.) (appellant's failure to adequately brief complaint trial court erred in striking summary-judgment evidence resulted in waiver of complaint on appeal); *Torres v. GSC Enters., Inc.*, 242 S.W.3d 553, 559 (Tex. App.—El Paso 2007, no pet.) (appellant waived complaint trial court erred in striking his summary-judgment evidence where he did not provide argument or authority supporting his contentions); *see also Ramirez v. Gelman*, No. 13-10-00618-CV, 2012 WL 987817, at *4 n.2 (Tex. App.—Corpus Christi–Edinburg Mar. 22, 2012, no pet.) (mem. op.) ("We will only consider contentions that are supported by clear and concise arguments . . . .").

## B. No-Evidence Summary Judgment

In a portion of their first issue, appellants argue that the trial court erred in granting Standard's no-evidence motion for summary judgment because "more than a scintilla of evidence supports the challenged elements of Aleman's various causes of action."

To prevail on a no-evidence summary-judgment motion, the movant must establish that there is no evidence to support an essential element of the non-movant's claim on which the non-movant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the non-movant to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524. A no-evidence summary-judgment may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements in the motion. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (internal quotations omitted). The trial court must grant a no-evidence summary-judgment motion if the movant asserts that there is no evidence of one or more specified elements of the non-movant's claim on which the non-movant would have the burden of proof at trial and the non-movant fails to file a timely response or fails to produce summary-judgment evidence raising a genuine issue of material fact on each challenged element. *See* TEX. R. CIV. P.

166a(i); *Lockett v. HB Zachry Co.*, 285 S.W.3d 63, 67 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

Here, Standard moved for a no-evidence summary judgment on Aleman's claims for breach of the duty of good faith and fair dealing, violations of the DTPA, and fraud, asserting that there was no evidence to support those claims. More specifically, as to Aleman's claim for breach of the duty of good faith and fair dealing, Standard asserted that to recover on such a claim, Aleman was required to show that (1) there was an insurance contract between Aleman and Standard, (2) Standard breached its duty when it (a) denied or delayed payment when liability was reasonably clear, or (b) cancelled Aleman's insurance policy without a reasonable basis, and (3) Standard's breach proximately caused Aleman's damages. But Aleman had no evidence that Standard had breached its duty by "denying or delaying payment to [Aleman] when liability was reasonably clear."

Further, as to Aleman's claim for violations of the DTPA, Standard asserted Aleman had no evidence that "Standard represented that any goods or services had characteristics, benefits, or qualities which they did not have," "Standard represented that [Aleman's] [p]olicy conferred rights and remedies which it did not have," "Standard failed to disclose information concerning [Aleman's] [p]olicy which was known at the time of purchase and such failure to disclose such information was intended to induce [Aleman] into a transaction into which [Aleman] would not have

35

entered had the information been disclosed," "Standard engaged in an unconscionable course of conduct," and "any act" allegedly committed by Standard "proximate[ly] cause[d]" any of Aleman's damages. *See* TEX. BUS. & COM. CODE ANN. §§ 17.46(b), 17.50(a).

Finally, as to Aleman's fraud claim, Standard asserted that to recover on her claim, Aleman needed to establish: (1) that a material representation was made, (2) the representation was false, (3) when the representation was made, Standard knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) Standard made the representation with the intent that Aleman should act upon it, (5) Aleman acted in reliance on the representation, and (6) Aleman suffered injury. But Aleman had no evidence that Standard made false statements, misrepresented material facts, "[]engaged in fraudulent acts for the purpose of misleading [Aleman] as to the actual damages resulting from the [purported] storm," "had knowledge of any alleged false statements or made any statement recklessly without any knowledge of the truth and as a positive assertion," "made any misrepresentation with the intent that [Aleman] act upon it," and "operated in [a] reckless disregard for [Aleman] in the course of handling [her] claim." (Internal quotations omitted.) Additionally, there was no evidence that Aleman "acted in reliance on any alleged misrepresentation [by] Standard or that she suffered any injury as a result of any act of alleged fraud."

36

A no-evidence motion for summary judgment is like a pre-trial motion for directed verdict. *See Draughon v. Johnson*, 631 S.W.3d 81, 88 (Tex. 2021). In its motion, the movant must state the elements of a claim as to which it believes there is no evidence. TEX. R. CIV. P. 166a(i); *Bolanos*, 649 S.W.3d at 762; *see also Roper v. CitiMortg., Inc.*, No. 03-11-00887-CV, 2013 WL 6465637, at *4 (Tex. App.—Austin Nov. 27, 2013, pet. denied) (mem. op.) ("A movant . . . who seeks a no-evidence summary judgment against another party's claim, must allege that there is no evidence of one or more essential elements of the claim on which the adverse party would have the burden of proof at trial."). The burden then shifts "to the nonmovant to present evidence raising a genuine issue of material fact supporting each element contested in the [no-evidence] motion." *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021).

Aleman attached to her response to Standard's no-evidence summary-judgment motion, her own affidavit, as well as a copy of Gadrow's repair estimate, and Gadrow's accompanying affidavit. But the trial court struck such evidence, and we have concluded that Aleman has either not challenged or waived any error related to the trial court's striking of her summary-judgment evidence. *See, e.g.*, *McCollum v. The Bank of N.Y. Mellon Tr. Co.*, 481 S.W.3d 352, 361–62 (Tex. App.—El Paso 2015, no pet.). Because the only evidence Aleman produced in response to Standard's no-evidence motion for summary judgment was struck by the

37

trial court,[9] there was no summary-judgment evidence for the trial court to consider, and without any responsive evidence to consider, the trial court was required to grant Standard's no-evidence summary-judgment motion. *See* TEX. R. CIV. P. 166a(i); *McCollum*, 481 S.W.3d at 362 (holding trial court was required to grant no-evidence motion for summary judgment because non-movant's evidence was struck); *Blackard v. Fairview Farms Land Co., Ltd.*, 346 S.W.3d 861, 869 (Tex. App.—Dallas 2011, no pet.) ("Once the trial court struck all of [appellant's] summary judgment evidence, she was left with no summary judgment evidence with which to raise a genuine issue of material fact . . . ."); *see also Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (trial court must grant no-evidence summary-judgment motion unless non-movant produces summary-judgment evidence raising genuine issue of material fact); *Jones v. Blume*, 196 S.W.3d 440, 445 (Tex. App.—Dallas 2006, pet. denied) (filing of no-evidence motion for summary judgment places burden on non-movant to present summary-judgment evidence raising genuine fact issue). Accordingly, we hold that the trial court did not err in granting Standard's

---

[9] In reviewing whether summary judgment was properly granted, an appellate court may not consider struck portions of the record because that evidence is not part of the summary-judgment record. *See McCollum v. The Bank of N.Y. Mellon Tr. Co.*, 481 S.W.3d 352, 361–62 (Tex. App.—El Paso 2015, no pet.).

no-evidence motion for summary judgment as to Aleman's claims for breach of the duty of good faith and fair dealing,[10] violations of the DTPA, and fraud.

We overrule this portion of appellants' first issue.

## C.    Matter-of-Law Summary Judgment

In the remaining portion of their first issue, appellants argue that the trial court erred in granting Standard's matter-of-law summary-judgment motion because "Aleman provided the [t]rial [c]ourt with more than a scintilla of evidence to substantiate her claims that she suffered a loss within her policy period that [was] covered by [her] policy and ha[d] not been paid."[11]

---

[10]    We further note that in her summary-judgment response, Aleman did not respond to Standard's no-evidence argument related to Aleman's claim for breach of the duty of good faith and fair dealing, and as such, the trial court was obligated to grant the no-evidence summary-judgment motion as to that claim. *See, e.g.*, *Wohlstein v. Aliezer*, 321 S.W.3d 765, 772–73 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also Hernandez v. Vazquez*, 656 S.W.3d 589, 594 (Tex. App.—El Paso 2022, no pet.) (where appellant did not respond to negligence per se portion of no-evidence summary-judgment motion, he waived any error in trial court's granting of summary judgment on his negligence per se claim).

[11]    Standard moved for summary judgment as a matter of law on Aleman's claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code.  We have already held that the trial court did not err in granting Standard's no-evidence summary-judgment motion as to Aleman's claim for breach of the duty of good faith and fair dealing.  Thus, we need not consider whether the trial court properly granted Standard's matter-of-law summary-judgment motion as to that claim on appeal.  *See* TEX. R. APP. P. 47.1; *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).  Instead, the memorandum opinion will focus on the propriety of the trial court's matter-of-law summary-judgment ruling on Aleman's claims for breach of contract and violations of the Texas Insurance Code.

To prevail on a matter-of-law summary-judgment motion, the movant must establish that no genuine issue of material fact exists and the trial court should grant judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for a matter-of-law summary judgment, it must either: (1) disprove at least one essential element of the plaintiff's cause of action, or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. *See Cathey*, 900 S.W.2d at 341; *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Once the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197; *Transcon. Ins. Co. v. Briggs Equip. Tr.*, 321 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of fact if reasonable and fair-minded fact finders could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

As to Aleman's breach-of-contract claim, Standard, in its summary-judgment motion, argued that Aleman could not recover on her claim as a matter of law because Aleman was unable to show that the property had sustained damages covered by her policy and, thus, could not establish that Standard had breached the policy by refusing to pay her the "full" amount she was owed under her policy.

40

To recover on her breach-of-contract claim, Aleman was required to establish the following elements: (1) the existence of a valid contract between her and Standard, (2) she performed or tendered performance, (3) Standard breached the contract, and (4) she was damaged as a result of the breach. *Tex. Windstorm Ass'n v. Dickinson Indep. Sch. Dist.*, 561 S.W.3d 263, 272 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Moreover, to prevail on a claim for breach of an insurance policy, Aleman had to establish that her claim was covered by her policy. *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 400 (Tex. 2016); *see also Powell v. USAA Cas. Ins. Co.*, No. 01-19-00308-CV, 2021 WL 1414217, at *8 (Tex. App.—Houston [1st Dist.] Apr. 15, 2021, pet. denied) (mem. op.) ("In the context of an insurance policy, a plaintiff must prove the existence of a valid insurance policy covering the denied claim and entitlement to money damages on that claim. The insured bears the initial burden to establish coverage under the policy." (internal citations omitted)). To prove coverage, Aleman had to show that the damage to the property was covered by the policy and that it was incurred at a time covered by the policy. *See Seger*, 503 S.W.3d at 400; *see also Stagliano v. Cincinnati Ins. Co.*, 633 Fed. Appx. 217, 219 (5th Cir. 2015).

Aleman's policy with Standard for the property was effective from December 12, 2019 to December 12, 2020.[12]  The policy stated that it "insure[d] against physical loss to the property" caused by a "[w]indstorm, [h]urricane and [h]ail."  In her affidavit, Johnson, the assistant claims manager for Standard, testified that Aleman, on February 9, 2021, notified Standard of a claim for hail and wind damage which Aleman asserted had occurred on October 23, 2020.[13]  An inspection of the property was done on February 11, 2021.

Strohl, in his declaration, explained that he inspected the property after Aleman made her claim with Standard "for a loss caused by . . . hail and wind on October 23, 2020."  When Strohl inspected the property on February 11, 2021, he did not find "any damage caused by hail or wind to the roof or exterior of the [p]roperty."  He also "found no evidence of wind damage to [Aleman's] fence or gazebo[,] and further found no evidence of any covered loss for the various damages found on the interior of the home."  Although his inspection of the property "revealed rotted decking on the roof's right slope; missing shingles on the right and left front gable; left-rear hip on [the] right slope; [and] missing shingles on a portion of the ridge showing weathered exposed decking," Strohl determined that the damage was

<hr>

[12]    Aleman's policy and the additional evidence discussed below were attached to Standard's summary-judgment motion.

[13]    In her petition, Aleman alleged that, on or about October 23, 2020, the property was damaged "as a result of a wind and hail storm," and she had submitted a claim to Standard for the damage caused to the property on October 23, 2020.

"preexisting and not caused by a named peril under [Aleman's] policy." Further, damage on the property's downspouts and the fence post "were not caused by hail or any covered event," and Strohl noted that although he found "hail damage to some window beading," a hail report showed that "no hail occurred on or near the [p]roperty during the [p]olicy period" of December 12, 2019 to December 12, 2020.[14]

Following Strohl's inspection, Standard notified Aleman that her claim was not covered by her policy because "none of the claimed damage was caused by a peril insured against in the [p]olicy." A letter sent by Standard to Aleman on February 24, 2021, listed her claim number, the date of loss as October 23, 2020, and the cause of loss as "[h]ail." The letter stated:

> As you are aware, this office received notice on February 9th 2021, for hail damage to your roofing system on you [sic] home. . . .
>
> Adjuster . . . Strohl's inspection . . . with you on February 11th 2021, revealed rotted decking on the roof's right slope; missing shingles on the right and left front gable; left-rear hip on [the] right slope; [and] missing shingles on a portion of the ridge showing weathered exposed decking. This damage is preexisting and not caused by a named peril under your policy therefore, not covered.

---

[14] The hail report showed that no "significant hail event" occurred at the property on October 22, 2020 through October 24, 2020, and "[h]ail greater than 0.75[] [inches] did not occur" at the property on October 23, 2020. Further, the last time there was hail measuring 0.75 inches in diameter was on August 27, 2019, 423 days before the reported date of loss. The estimated wind speed on those days was thirty-five miles per hour.

Additionally, the inspection revealed hail damage to the window beading. Your . . . policy [was] in effect as of December 12th 2019 through December 12th 2020, which constitutes the time for which coverage will be afforded. We have received the hail event report which concludes the hail which damaged your home occurred prior to your policy inception. Therefore, there is no coverage for the hail damage prior to your policy incept[ion] date.

The interior inspection revealed damage in the game room right below the damaged ridge on the roof as well as in the hall bathroom ceiling. This is a repeated event, therefore not covered under your policy.

During the inspection the adjuster noted damage to the downspouts and the fence post on the right elevation was leaning and not damaged due to any named peril under your policy. No coverage applies.

. . . There is no coverage for the damages as reported.

. . . .

. . . [T]he purpose of this letter is to advise you that there is no coverage for the deteriorated roofing system, interior damage to ceilings, fencing and hail damage to window beading to your home.

Aleman testified in her deposition that she could not recall the weather event that occurred on October 23, 2020 that caused her to file her claim with Standard. She also could not recall what happened in February 2021—when she filed her claim—that caused her to think she had a claim for damage to the property. Aleman could not say whether a storm had occurred at the property around October 2020.

Instead, according to Aleman, at some point, "someone . . . stop[ped] by to look at [the property] and there was some damage," but she did not remember who

44

that "someone" was or what kind of damage he saw. She had not seen damage to the property and did not know the cause of any damage to the property.

Aleman also noted that she had never had her roof repaired, and she did not know when the damage to her roof had occurred, i.e., whether or not it was during her policy period. Further, she did not know when shingles had gone missing from the roof, and she did not remember any water entering the home. She also did not know that "there were rugs being used to patch [the] roof." She was not told by anyone that hail or wind had caused the rotting wood outside the game room window of the home, and she did not know what had caused any of the damage found by Strohl when he inspected the property in February 2021. No one had ever told her that the interior damage to the home was caused by hail or wind.

As to Aleman's designated expert witnesses, Bray, who stated he was available to answer "coverage questions," testified in his deposition that he had never spoken to Aleman and had not inspected the property. Bray "believe[d]" that Aleman's claim "was a wind or hail or maybe [a] wind and hail claim," but he did not get on the property's roof and observe the damage personally. Although he had viewed photographs of the property, he did not know when the damage to the property's roof had occurred, and he did not know if a weather event had occurred in October 2020, as alleged by Aleman, or during Aleman's policy period. To the

extent that there was damage to the interior of the home, he believed that the damage was caused by water, but he did not know when that damage occurred.

Similarly, Gadrow, one of Aleman's designated expert witnesses, testified that he inspected the property in 2021, but he did not speak to Aleman. Gadrow believed that the damage to the property had been caused by "the freeze," but he did not know when "the freeze" had occurred. He also admitted that he could not say "exactly what [had] happened"; "the freeze" was just his "best guess." He could not determine what had caused certain damage to the property's roof or when that damage had occurred.

Gadrow also testified that he thought the damage to the ceiling and the wall inside Aleman's home was caused by ice damming on the roof, and other damage inside the home "could be a leaking pipe" or it "could be a leak from the roof dripping off of a rafter." But there were "a number of different ways that [the damage] c[ould] [have] happen[ed]." Gadrow did not have a conclusion as to what had caused the damage inside the home, and he did not know when the damage occurred. While investigating both the outside and inside damage to Aleman's home, he did not see any damage that was caused by hail.

Further, Morgan, another one of Aleman's designated experts, testified at his deposition that he had never been to the property, and he had never spoken to Aleman. He reviewed certain photographs of the property from which he concluded

46

that damage to the roof had been caused by wind. But as to the timing of the damage, he testified that he had only identified wind events that had occurred in September and October 2021—a timeframe outside of Aleman's policy coverage and after October 23, 2020 the date Aleman had alleged that the damage had occurred.

Finally, Perera, a designated expert for Aleman, testified in his deposition that he did not intend to testify as to whether the damage to the property was covered by Aleman's policy. He had not inspected the property, and he had never spoken to Aleman. Perera viewed photographs of the property and believed that the damage to the roof was caused by wind, not hail.[15] However, the photographs that he viewed were taken in August 2021, even though the damage to the property purportedly occurred in October 2020. Perera did not know when the damage in the photographs had occurred. As to the interior of the home, Perera stated that the photographs showed water intrusion from a leak.

Based on the foregoing, we conclude that Standard's uncontroverted summary-judgment evidence[16] established as a matter of law that Aleman could not

---

[15] He also noted that some damage he saw was caused by a tree rubbing against the roof, and some could have been caused by wind along with temperature changes.

[16] As previously mentioned, the trial court struck the summary-judgment evidence attached to Aleman's summary-judgment response, including Aleman's affidavit which she relies on in her briefing. We may not consider the struck evidence in determining whether there was a genuine issue of material fact as to coverage because that evidence was not part of the summary-judgment record. *See McCollum v. The Bank of N.Y. Mellon Tr. Co.*, 481 S.W.3d 352, 361–62 (Tex. App.—El Paso 2015, no pet.). We also do not consider any evidence attached to Aleman's motion

show that the damage to the property was covered by her policy or that the damage was incurred at a time covered by the policy. *See Seger*, 503 S.W.3d at 400; *see also Stagliano*, 633 Fed. Appx. at 219. As such Aleman is unable to maintain a breach-of-contract claim against Standard, and we hold that the trial court did not err in granting Standard summary judgment on Aleman's breach-of-contract claim against it.

Turning to Aleman's claim for violations of the Texas Insurance Code, we note that "[w]hen the issue of coverage [has been] resolved in [an] insurer's favor, extra-contractual claims[17] do not survive." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010). Further, generally, an insured cannot recover policy benefits as statutory damages caused by an insurer's statutory violation unless there has been a finding that the insured had a right to receive those benefits under the insurance policy. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 489, 494–95, 500 (Tex. 2018); *Conlee v. ASI Lloyds*, No. 01-23-00159-CV, 2024 WL 3503067, at *4 (Tex. App.—Houston [1st Dist.] July 23, 2024, no pet.) (mem. op.). Because we

---

for new trial. *See Eckhardt v. Nestra*, No. 04-16-00394-CV, 2017 WL 1244442, at *2 (Tex. App.—San Antonio Apr. 7, 2017, no pet.) (mem. op.) (not considering evidence filed with appellant's new-trial motion in reviewing trial court's summary-judgment ruling); *Rodriguez v. Spencer*, 902 S.W.2d 37, 45 (Tex. App.—Houston [1st Dist.] 1995, no writ).

[17] *See Prime Time Fam. Ent. Ctr., Inc. v. AXIS Ins. Co.*, 630 S.W.3d 226, 229 (Tex. App.—Eastland 2020, no pet.) (noting claims for violations of chapters 541 and 542 of Texas Insurance Code constitute extra-contractual claims).

have held that Aleman is unable to show coverage for her claim related to the property as a matter of law, and thus cannot establish a breach of contract, she is also unable to maintain her extra-contractual claims for violations of the Texas Insurance Code.[18] *See, e.g.*, *Reyes v. S. Vanguard Ins. Co.*, No. 14-19-00728-CV, 2020 WL 6741942, at *5 (Tex. App.—Houston [14th Dist.] Nov. 17, 2020, no pet.) (mem. op.); *Prime Time Fam. Ent. Ctr., Inc. v. AXIS Ins. Co.*, 630 S.W.3d 226, 233 (Tex. App.—Eastland 2020, no pet.). Accordingly, we further hold that the trial court did not err in granting Standard summary judgment on Aleman's claim for violations of the Texas Insurance Code.

We overrule this portion of Aleman's first issue.

## Attorney's Fees

In their second issue, appellants argue that the trial court erred in awarding Standard attorney's fees as sanctions because Aleman's suit was not groundless or brought in bad faith or for purposes of harassment. In their third issue, appellants argue that the trial court erred in awarding Standard attorney's fees because the evidence was insufficient to show that the fees were reasonable and necessary.

---

[18] Aleman does not assert that the independent-injury exception applies to this case. *See State Farm Lloyds v. Fuentes*, 597 S.W.3d 925, 938, 940 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

49

## A.     Sanctions

In its final judgment, the trial court granted Standard's request for attorney's fees pursuant to Texas Insurance Code section 541.153, Texas Rule of Civil Procedure 13, Texas Civil Practice and Remedies Code section 10.001, and Texas Business and Commerce Code section 17.50(c).

A trial court is authorized to impose sanctions, including attorney's fees, against a party or the party's attorney by rule, statute, or inherent authority. *Powell v. Grimes*, No. 01-23-00129-CV, --- S.W.3d ---, 2025 WL 626428, at *10 (Tex. App.—Houston [1st Dist.] Feb. 27, 2025, no pet.); *Sadeghian v. Webb*, No. 2-03-367-CV, 2005 WL 737424, at *6 (Tex. App.—Fort Worth Mar. 13, 2005, pet. denied) (mem. op.) (sanctions can include attorney's fees); *see, e.g.*, TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE ANN. §§ 10.001–.006; *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 718 (Tex. 2020) ("Courts . . . possess inherent powers that aid the exercise of their jurisdiction, facilitate the administration of justice, and preserve the independence and integrity of the judicial system.  A court's inherent authority includes the 'power to discipline an attorney's behavior.'" (internal footnotes omitted)).

Texas Rule of Civil Procedure 13 states that the signature of a party or an attorney constitutes a certificate that the pleading, motion, or other paper filed, to the best of her knowledge, "is not groundless and brought in bad faith or groundless and

brought for the purpose of harassment." TEX. R. CIV. P. 13. Under rule 13, a trial court may impose a sanction when a pleading is filed that is groundless and brought in bad faith or groundless and brought for the purposes of harassment. *See id.*; *Sakonchick v. Overlook at Rob Roy Owner, LLC*, No. 03-23-00085-CV, 2025 WL 626590, at *16 (Tex. App.—Austin Feb. 27, 2025, pet. denied) (mem. op.). "Groundless" means there is no basis in law or fact and the pleading is not warranted by a good faith argument for the extension, modification, or reversal of existing laws. TEX. R. CIV. P. 13 (internal quotations omitted).

Texas Civil Practice and Remedies Code chapter 10 provides that the signature of an attorney or a party on a pleading or motion constitutes a certificate by her that, to the best of her knowledge, information, and belief formed after a reasonable inquiry, the instrument is not being presented for an improper purpose, is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law, and there is evidentiary support for each allegation or contention. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 10.001. Thus, there are two requirements under chapter 10: (1) the claims made in a pleading must not be frivolous and (2) the pleading may not be made for an improper purpose. *Fontenot v. Little*, No. 01-07-00328-CV, 2009 WL 144579, at *2 (Tex. App.—Houston [1st Dist.] Jan. 22, 2009, no pet.) (mem. op.). "A court that determines that a person has signed a pleading or motion in violation

51

of [s]ection 10.001 may impose a sanction on the person, party represented by the person, or both." TEX. CIV. PRAC. & REM. CODE ANN. § 10.004(a); *see also Fontenot*, 2009 WL 144579, at *2 (trial court's finding claims made in pleading were frivolous or pleading made for improper purpose supported imposition of sanctions).

We review a trial court's ruling on a motion for sanctions for an abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004); *Knoderer v. State Farm Lloyds*, 515 S.W.3d 21, 31 (Tex. App.—Texarkana 2017, pet. denied). We will reverse the trial court's ruling only if it "acted 'without reference to any guiding rules and principles,' such that its ruling was arbitrary or unreasonable." *Am. Flood Rsch., Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Appellants must attack all independent grounds that fully support an adverse ruling. *Fontenot*, 2009 WL 144579, at *2; *Britton v. Tex. Dep't of Crim. Just.*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet*.); see also Sheets v. Autogrp. Premier, Inc.*, No. 14-18-00279-CV, 2020 WL 548366, at *2 (Tex. App.—Houston [14th Dist.] Feb. 4, 2020, no pet.) (mem. op.) ("The rule that an appellant must attack all independent grounds supporting an order or judgment has been applied in many contexts, including judgments awarding monetary sanctions."). If appellants fail to do so, we must affirm the ruling. *Fontenot*, 2009 WL 144579, at *2; *Britton*, 95 S.W.3d at 681.

In their briefing, appellants only assert that the trial court erred in awarding Standard attorney's fees as sanctions under Texas Rule of Civil Procedure 13. Rule 13 and Texas Civil Practice and Remedies Code chapter 10 are "independent grounds on which the trial court based its ruling." *Fontenot*, 2009 WL 144579, at *2. Appellants do not raise a challenge under chapter 10 to the trial court's attorney's fees award, which could, if meritorious, independently support the award.[19] *Id.*; *see also In re Hansen*, No. 05-06-00585-CV, 2007 WL 824587, at *1 (Tex. App.—Dallas Mar. 20, 2007, orig. proceeding) (mem. op.) (overruling appellant's assertion trial court erred in awarding attorney's fees pursuant to Texas Rules of Civil Procedure 13 and 215.2(b) because appellant did not challenge sanctions award under Texas Civil Practice and Remedies Code chapter 10). Because appellants do not challenge all the grounds under which the attorney's fees award was imposed, we must uphold the award. *Fontenot*, 2009 WL 144579, at *2; *see also Sheets*, 2020 WL 548366, at *2, *4. Accordingly, we hold that the trial court did not err in awarding Standard attorney's fees as sanctions.

We overrule appellants' second issue.

---

[19] Appellants do not refer to or cite Texas Civil Practice and Remedies Code chapter 10 in their briefing. *See generally* TEX. R. APP. P. 38.1(i). They also make no reference to Texas Insurance Code section 541.153 or Texas Business and Commerce Code section 17.50(c)—which the trial court, in its final judgment, also relied on to support its award of attorney's fees to Standard. *See generally id.*

53

## B.    Reasonable and Necessary

In a portion of their third issue, appellants argue that the jury's award of trial court attorney's fees was unreasonable and unnecessary as a matter of law because Standard "failed to offer any testimony that th[e] [attorney's fee] rates were reasonable," Daena Goldsmith Ramsey—Standard's attorney—did not testify "that the $136,941.50 in fees [she] incurred . . . were, in her expert opinion, reasonable or necessary," and Standard "failed to present any evidence required by" *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997).[20]  (Emphasis omitted.)

Appellants further argue, as part of their third issue, that the jury's award of appellate attorney's fees was supported by legally insufficient evidence because "[a] party seeking to recover . . . appellate attorney's fees must provide expert testimony about the services [it] reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services."[21]  Appellants also argue that the trial

---

[20]    A "matter of law point[]" is a legal-sufficiency challenge. *See Raw Hide Oil & Gas, Inc. v. Maxus Expl. Co.*, 766 S.W.2d 264, 275–76 (Tex. App.—Amarillo 1988, writ denied) (internal quotations omitted).  Appellants also assert, in their third issue, that the jury's award of trial court attorney's fees was excessive.  A challenge to attorney's fees as being excessive is a factual sufficiency challenge to the attorney's fees award.  *Tite Water Energy, LLC v. Wild Willy's Welding LLC*, No. 01-22-00158-CV, 2023 WL 5615816, at *10 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. denied) (mem. op.). Due to our disposition below, we need not address appellants' factual-sufficiency challenge to the award of trial court attorney's fees. *See* TEX. R. APP. P. 47.1.

[21]    In a single sentence in their opening brief, appellants mention that the "award of appellate fees" was not supported by "factually sufficient evidence."  To the extent

54

court erred in awarding Standard appellate attorney's fees because the award was unconditional.

We review a trial court's award of attorney's fees for an abuse of discretion. *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018). We may review the amount of attorney's fees awarded for legal sufficiency. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

When appellants attack the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate on appeal that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a legal-sufficiency challenge if the record shows: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018); *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In determining whether there is no evidence to support a jury's finding, all the record evidence must be considered in the light most favorable to the party in whose favor the verdict has been rendered.

that appellants attempt to challenge the factual sufficiency of the evidence supporting the jury's award of appellate attorney's fees, we hold that the issue is waived due to inadequate briefing. *See id.* 38.1(i); *Trimcos*, 649 S.W.3d at 921.

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). As the Texas Supreme Court has stated, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. In conducting our review of the legal sufficiency of the evidence, we are mindful that the jurors, as fact finders, "are the sole judges of the credibility of the witnesses and the weight to give their testimony," and it is jurors' role to resolve any conflicts in the evidence. *Id.* at 819–20.

### 1. Trial Court Attorney's Fees

In *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, the Supreme Court of Texas clarified Texas law regarding the evidence a party must introduce to make a legally sufficient showing as to trial court attorney's fees. 578 S.W.3d 469, 486–506 (Tex. 2019). In reaching its decision, the supreme court explained that Texas generally applied what was known as the lodestar method, which incorporated the well-known *Arthur Andersen* factors. *Id.* at 497–501 (explaining lodestar method of calculating attorney's fees incorporated into base calculation most considerations previously set forth in *Arthur Andersen* and specifying lodestar method of calculating attorney's fees should be used whenever fees may be calculated by multiplying reasonable hours by reasonable rates). Under the lodestar method, a party seeking attorney's fees had to first adduce sufficient evidence of the reasonable

hours worked by the attorneys and their reasonable hourly rates. *Id.* at 497–98, 501. The multiplication of these figures—hours x rates—resulted in a base amount of attorney's fees that was presumptively reasonable. *Id.* at 498–99, 501.

But, according to the court, general, conclusory testimony lacking real substance could not support a fee award. *Id.* at 501. So, for example, testimony estimating the collective number of hours worked by attorneys, attributing these hours to several general categories of tasks, and swearing these tasks were reasonable and necessary was insufficient. *See id.* at 494–95. Likewise, testimony that did no more than specify the number of hours worked by attorneys and their respective billing rates accompanied by general representations that their time was occupied with extensive discovery, several pretrial hearings, multiple summary-judgment motions, and trial was insufficient. *See id.* at 495–96. In part, such generalities were legally insufficient to support an attorney's fee award because they effectively amounted to the subjective say-so of attorneys, which could not be meaningfully evaluated by a fact finder or reviewed by an appellate court. *See id.* at 496, 498 (characterizing lodestar method as "focused and objective analysis" of reasonableness and necessity of attorney's fees that was "readily administrable," limited discretion of trial courts and other fact finders, and allowed real judicial review).

Thus, to be legally sufficient as to trial court attorney's fees, the supreme court concluded that testimony about the reasonable hours worked by attorneys and their reasonable rates must, at a minimum, include evidence of:

(1)     the particular services performed;

(2)     who performed these services;

(3)     approximately when they performed these services;

(4)     the reasonable amount of time required to perform these services; and

(5)     the reasonable hourly rate for each person who performed them.

*Id.* at 498, 502. Further, fees resulting from excessive, redundant, or otherwise unneeded services should not be considered and should be excluded. *Id.* at 498–99. Rates needed to reflect the legal market in the community as well as an attorney's experience, skill, and reputation. *Id.* at 499. If such evidence was introduced, then the resulting lodestar calculation was presumptively the amount of reasonable and necessary fees. *Id.*

The supreme court also explained that parties could rebut the presumption of reasonableness and necessity with additional evidence, effectively adjusting the lodestar calculation up or down based on relevant considerations. *Id.* at 500. But because the lodestar calculation usually already accounted for most of the *Arthur Andersen* considerations—including the time and labor necessary, novelty and difficulty of questions at issue, skill needed to perform the legal services, fee

customarily charged for like services in the area, amount at stake, abilities of the attorneys and their reputations, whether the fee is fixed or contingent, uncertainty of collection before the work is done, and the results obtained—an enhancement or reduction of the fee ordinarily could not be premised on such considerations. *Id.* at 500–01. Instead, an enhancement or reduction in the lodestar amount needed to be based on specific evidence showing that a higher or lower amount of attorney's fees was necessary to effect an award of reasonable and necessary fees. *Id.* at 501–02. As a result, an upward or downward adjustment was rarely warranted. *See id.* at 502 (agreeing presumption lodestar calculation resulted in reasonable and necessary amount of attorney's fees could only be overcome in "rare circumstances").

In clarifying the standard for legal sufficiency as to trial court attorney's fees, the supreme court concluded that contemporaneous billing records were not required. *Id.* Nonetheless, the court "strongly encouraged" their use as evidence, reasoning that in all but the simplest cases, an attorney would likely have to refer to these records or other documentation to provide legally sufficient testimony about the reasonableness and necessity of her fees. *Id.* (emphasis omitted). Moreover, billing records could provide additional information that allowed an attorney to testify more succinctly. *See id.* at 502–03, 505 (indicating billing records would allow opposing counsel to identify areas of dispute and thereby facilitate agreement as to fees or at least narrow or focus disagreements about fees and observing that

59

attorneys "should not have to take the stand for days and testify to every detail of a three-year-long case" to justify fees).

In *Rohrmoos*, the supreme court ultimately concluded the attorney's testimony, which was not accompanied by billing records, was too general to serve as legally sufficient evidence of the reasonableness and necessity of the more than $800,000 in trial court fees found by the jury and awarded by the trial court. *Id.* at 486, 505; *see also Nath v. Tex. Children's Hosp.*, 576 S.W.3d 707, 710 (Tex. 2019) (holding conclusory affidavits reciting only generalities did not satisfy standard articulated in *Rohrmoos* and therefore were legally insufficient to support fees imposed as sanctions); *Patriot Contracting, LLC v. Shelter Prods., Inc.*, 650 S.W.3d 627, 657–58 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) (reiterating legal-sufficiency standard stated in *Rohrmoos* and restating that generalities as to tasks performed were not enough and there must be evidence about time spent on specific tasks).

In this case, as to trial court attorney's fees, Ramsey testified before the jury that she began practicing law in 1988 and a large part of her practice involved representing insurance companies in suits like Aleman's where claims had been filed against the insurance companies. She was board certified in civil trial law and had received the distinction of Super Lawyer. She owned her own law firm and had handled cases in Harris County, Texas county courts for over thirty years.

In the instant case, she represented Standard. Most of her cases with Standard were litigated in Harris County courts. Her normal hourly rate was $450 to $550, while an associate attorney's normal hourly rate at her firm was $400 and a paralegal's normal hourly rate was $225. She charged Standard a discounted rate of $300 an hour for attorneys' work and $175 for paralegals' work on this case. She also did not charge Standard for all work performed in the case.

Ramsey stated that her work in the case began with reviewing the petition and Aleman's policy with Standard and "figuring out what [Standard was] being sued for." Ramsey drafted and filed special exceptions in the case because she "could not tell from the petition" the reason for Aleman's suit. Ramsey also filed a counterclaim on behalf of Standard for attorney's fees.[22] During the course of the suit, Ramsey had to deal with noncompliant disclosures from Aleman, which required multiple emails with Aleman's attorneys and the filing of a motion in the trial court. Additionally, related to discovery, Aleman was not responsive, which required Ramsey to spend time contacting Aleman's attorneys and filing a motion to compel.[23] Ramsey also needed orders from the trial court to get Aleman to answer Standard's discovery requests.

---

[22] Ramsey filed two motions requesting attorney's fees.

[23] Ramsey noted that she filed five motions to compel in the trial court.

Further, because Aleman had designated multiple expert witnesses in her petition, Ramsey had to take the depositions of six to seven of those designated expert witnesses. Ramsey had to subpoena the expert witnesses because Aleman would not produce them for depositions. After the expert witnesses received their subpoenas, they called Ramsey because they did not know about Aleman's case and had never been retained by Aleman—despite Aleman having designated them as her expert witnesses. According to Ramsey, it cost $400 to subpoena the witnesses and multiple emails were required to schedule the depositions. Aleman cancelled some of scheduled depositions at the last minute. It took five or six months to get the expert witnesses deposed. To prepare for the depositions, attorneys at Ramsey's law firm had to review the claim file and determine what needed to be asked of the witnesses. Ultimately, Ramsey determined that what Aleman had disclosed her expert witnesses would testify about was false. It cost $7,000 to take the depositions of Aleman's purported expert witnesses, which included the cost for paying court reporters and the cancellation fees.

Ramsey also testified that she filed a motion for summary judgment on Standard's behalf in the case, which typically would take her anywhere from three to 100 hours of work to prepare because of the difficulty involved. She believed that she spent at least thirty hours working on the summary-judgment motion. A hearing on the summary-judgment motion was held, which Ramsey attended. After the

summary-judgment motion was granted, Aleman filed a motion for findings of fact and conclusions of law, which Ramsey had to respond to. Ramsey also responded to Aleman's new-trial motion and attended a hearing on the motion. And Ramsey responded to a "motion to late file, designate an expert" and attended a hearing on that matter. Finally, because Aleman requested a jury trial on attorney's fees, Ramsey prepared a jury charge on behalf of Standard, filed pretrial motions and exhibits, and "work[ed] with witnesses." *Cf. Intertek USA, Inc. v. Trical Com. Invs., LLC*, No. 14-23-00475-CV, 2025 WL 1232342, at *9 (Tex. App.—Houston [14th Dist.] Apr. 29, 2025, no pet.) (mem. op.) (lead attorney's testimony identifying "several broad categories of work performed—depositions, sorting through discovery, filing motions, serving subpoenas, preparing for trial—either by him, someone else at his firm, or by [client's] prior counsel" was legally insufficient to support attorney's fees award); *Eason v. Deering Constr., Inc.*, No. 02-19-00310-CV, 2020 WL 7062687, at *8 (Tex. App.—Fort Worth Dec. 3, 2020, no pet.) (mem. op.) ("While [party's] counsel testified to the aggregate amount of fees and the general tasks carried out by himself and his two associates, this sort of evidence has been held to be insufficient.").

During her testimony, Ramsey described Aleman's suit as a difficult case that required "great skill," and she noted that it was time consuming. Ramsey declined work from several other clients because of her work on this case, but also because

of her work for other clients. According to Ramsey, the total amount of attorney's fees that Standard incurred in the case through the trial was $136,941.50.

In addition to Ramsey's testimony, the trial court admitted into evidence, among other things, a copy of its docket sheet, Ramsey's resume, a summary of Standard's attorney's fees and costs, which stated a total of $129,707.63, invoices sent to Standard for payment of attorney's fees and costs, which totaled $131,252.63, and a summary of Standard's deposition expenses, which stated a total of $7,134.25.

The invoices provided descriptions of the work completed by Ramsey, a partner, as well as other attorneys, paralegals, and administrative staff employed by her law firm. They also included information about hourly rates and when particular services were performed. *See Rohrmoos*, 578 S.W.3d at 502, 505 (stating legally sufficient evidence of attorney's fees includes evidence of particular services performed, when they were performed, who performed such services, and reasonable hourly rate for person performing services, along with some details regarding work performed). Although some associate attorneys are listed by name in the invoices, certain paralegals are not identified by name, and neither are administrative staff nor legal assistants whose work on the case was charged to Standard. Further, based on billing rates, it appears that other partner-level attorneys may have worked on Aleman's suit, but that is not entirely clear from the invoices.

64

The jury awarded Standard $137,000 in attorney's fees for "representation in the trial court." Although Ramsey testified as to her experience and reputation and her resume was admitted into evidence, there was no evidence admitted regarding the skill, experience, or reputation of any other attorney, paralegal, or legal assistant for whom fees were sought.[24] This is necessary to show that the fees sought for these individuals were reasonable. *See Westheimer v. Ziemer*, 702 S.W.3d 621, 633–34 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (holding evidence of attorney's fees was legally insufficient where there was "no evidence regarding the skill, experience, or reputation of any attorney for who fees [were] sought other than [the testifying attorney]" and "no information about the qualifications of the legal assistants who worked on the case"); *Walsh v. Gonzalez*, No. 01-21-00729-CV, 2023 WL 4110851, at *11 (Tex. App.—Houston [1st Dist.] June 22, 2023, no pet.) (mem. op.) ("[T]o recover paralegal fees, the evidence must show: (1) the paralegal's qualifications to perform substantive legal work, (2) that the paralegal performed substantive legal work under an attorney's direction and supervision, (3) the nature of the legal work performed, (4) the paralegal's hourly rate, and (5) the number of hours the paralegal expended.").

The attorney's fees evidence admitted in this case is similar to evidence in other cases we have considered in the past. *See, e.g.*, *Westheimer*, 702 S.W.3d at

---

[24] The invoices admitted into evidence do not supply this information.

633–34; *Calleja-Ahedo v. Compass Bank*, No. 01-15-00210-CV, 2020 WL 3820420, at *3, *6–13 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.). For example, in *Calleja-Ahedo*, the appellee, Compass Bank, was awarded attorney's fees in the trial court. 2020 WL 3820420, at *5. On appeal, the appellant argued that the trial court erred in awarding Compass Bank its fees because the evidence was legally insufficient to prove that the awarded trial court fees were reasonable and necessary. *Id.* at *6, *10–13. This Court noted that, in the trial court, one of Compass Bank's attorneys submitted affidavit testimony and billing records or invoices to support Compass Bank's request for fees. *See id.* at *10–12. Although the evidence of attorney's fees admitted included invoices describing the tasks performed by members of the law firm, the date the tasks were performed, the individuals performing the tasks, the number of hours billed for each task, and the amount billed for each task, we explained that the invoices "reflected that work was performed, throughout the case, by . . . individuals" other than just the testifying attorney. *Id.* at *12. The invoices identified those individuals by names and stated the amount of hours that they worked as well as their hourly rates, but the record contained "no evidence . . . concerning the qualifications of th[e] individuals or whether the legal assistants and paralegals performed substantive legal work under [the testifying attorney's] direction." *Id.*; *cf. State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 99 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (upholding fee

award and noting evidence included testimony concerning experience and qualifications not just of lead attorney, but also his two associate attorneys and additional lawyer who assisted on case); *River Oaks L-M, Inc. v. Vinton-Duarte*, 469 S.W.3d 213, 233 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding sufficient evidence supported fee award and noting attorney "expressly described the qualifications of his legal assistant, that she performed substantive legal work under his direction and supervision, and the nature of the legal work she performed"). As such, we concluded that the evidence admitted in the trial court did not establish "that the amounts charged by th[e] [other] individuals [who worked on the case were] reasonable and necessary." *Calleja-Ahedo*, 2020 WL 3820420, at *12. And we held that the evidence was legally insufficient to support the trial court's attorney's fees award in favor of Compass Bank. *Id.* Accordingly, we reversed the trial court's judgment as to trial court attorney's fees awarded to Compass Bank and remanded the case to the trial court for further proceedings on attorney's fees. *Id.* at *13.

We are presented with the same scenario regarding the attorney's fees evidence, or lack thereof, as we were in *Calleja-Ahedo*. Thus, as we did in that case, we conclude that the evidence is legally insufficient to support the trial court's award of trial court attorney's fees to Standard. *See id.* at *12; *see also Westheimer*, 702 S.W.3d at 633–34; *Trujillo v. Shafaii Invs., Ltd.*, No. 01-22-00819-CV, 2024 WL

67

2001612, at *11 (Tex. App.—Houston [1st Dist.] May 7, 2024, no pet.) (mem. op.) ("We may not uphold a trial court's award of attorney's fees unless the record contains sufficient evidence to support the award. The party seeking attorney's fees bears the burden of proof to support the trial court's award. If the evidence supporting the award is insufficient, we must reverse." (internal quotations and citations omitted)). We hold that the trial court erred in awarding Standard $137,000 in trial court attorney's fees.

We sustain this portion of appellants' third issue.

### 2.    Appellate Attorney's Fees

As to appellate attorney's fees, Ramsey testified:

. . . [I]f there's an appeal, that's a whole other process. [$]7,000 for an appeal. That's the easy part. The rest of the part is getting the record and filing briefs. Then there's oral argument. Then there's the Texas Supreme Court which is a three-stage process that you may or may not get to the full court. So we started with a representation to the Court of Appeals. Because a lot of this has already been briefed, it would be $25,000. If the Texas Supreme Court accepts what's called a petition for review, again, it's $10,000. If the court at that stage wants some briefing to see whether it still wants to take the case, that is another [$]10,000. If the Texas Supreme Court does take the case, I am anticipating it would be about [$]15,000 to fully brief, make oral argument at the Texas Supreme Court. I don't think that will happen, but these are just anticipating if the appeal is filed, these are the kind of fees that we would incur.

Following Ramsey's testimony, the jury awarded Standard $16,250 "[f]or representation in the court of appeals," $10,000 "[f]or representation at the petition for review stage in the Supreme Court of Texas," $10,000 "[f]or representation at

the merits briefing stage in the Supreme Court of Texas," and $12,000 "[f]or representation through oral argument and the completion of proceedings in the Supreme Court of Texas." The trial court, in its final judgment, awarded Standard appellate attorney's fees in accordance with the jury's findings, but did not condition the award upon Standard's success on appeal. Appellants first complain about the trial court's unconditional appellate attorney's fees award.[25]

A trial court may not penalize a party for taking a successful appeal. *Hoefker v. Elgohary*, 248 S.W.3d 326, 332 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Sipco Servs. Marine, Inc. v. Wyatt Field Serv.*, 857 S.W.2d 602, 607–08 (Tex. App.—Houston [1st Dist.] 1993, no writ). Thus, an award of appellate attorney's fees must be conditioned upon the appellants' unsuccessful appeal. *Sipco Servs. Marine*, 857 S.W.2d at 607–08; *Keith v. Keith*, 221 S.W.3d 156, 171 (Tex. App.— Houston [1st Dist.] 2006, no pet.). Simply put, an unconditional award of appellate

---

[25] Standard asserts that appellants waived their complaint about the trial court's failure to award appellate attorney's fees conditioned on Standard's success on appeal, we disagree. *See, e.g.*, *Branfman v. Alkek*, No. 13-18-00554-CV, 2020 WL 2776719, at *5 (Tex. App.—Corpus Christi–Edinburg May 28, 2020, no pet.) (mem. op.) (holding appellant did not waive his objection to unconditional appellate attorney's fees award); *see also Ventling v. Johnson*, 466 S.W.3d 143, 156 (Tex. 2015) ("An award of conditional appellate attorney's fees to a party is essentially an award of fees that have not yet been incurred and that the party is not entitled to recover unless and until the appeal is resolved in that party's favor. [Thus,] . . . because an award of appellate attorney's fees depends on the outcome of the appeal, it is not a final award until the appeal is concluded and the appellate court issues its final judgment." (internal quotations omitted)).

attorney's fees is improper. *Sagredo v. Bell*, 689 S.W.3d 407, 415 (Tex. App.—Corpus Christi—Edinburg 2024, no pet.); *see also Tite Water Energy, LLC v. Wild Willy's Welding LLC*, No. 01-22-00158-CV, 2023 WL 5615816, at *12 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. denied) (mem. op.) ("Trial courts do not have discretion to award appellate attorney's fees that are not conditioned on the [appellant's] failure to obtain relief [on appeal]." (internal quotations omitted)).

Generally, the proper remedy for an unconditional award of appellate attorney's fees is to modify the trial court's judgment and make the award contingent upon the receiving party's success on appeal. *Hoefker*, 248 S.W.3d at 332–33; *Keith*, 221 S.W.3d at 171. Here, however, appellants also assert that the evidence was legally insufficient to support the jury's award of appellate attorney's fees. We agree.

To prove a conditional award of appellate attorney's fees, a party must make a request for such fees and it "must also . . . provide[] opinion testimony about the services [it] reasonably believe[s] will be necessary to defend [an] appeal and a reasonable hourly rate for those services." *Fiamma Statler, LP v. Challis*, No. 02-18-00374-CV, 2020 WL 6334470, at *19 (Tex. App.—Fort Worth Oct. 29, 2020, pet. denied) (mem. op.) (internal quotations omitted); *see also Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020); *MRT of Kemp TX-SNF, LLC v. Lloyd Douglas Enters., LC*, 698 S.W.3d 607, 619 (Tex. App.—Dallas 2024, no pet.)

70

("[A] party seeking to recover conditional appellate fees . . . [must] provide opinion testimony about the services it reasonably believes will be necessary to defend [an] appeal and a reasonable hourly rate for those services."). Ramsey's testimony concerning appellate attorney's fees merely constituted a request for such fees and did not serve as evidence of their reasonableness and necessity. *See Fiamma*, 2020 WL 6334470, at \*19. Because Ramsey's testimony did not identify the services that she reasonably believed would be necessary to defend an appeal and did not identify a reasonable hourly rate for the performance of any of such services, we conclude that the evidence was legally insufficient to support the jury's award of appellate attorney's fees to Standard. *See, e.g.*, *MRT of Kemp*, 698 S.W.3d at 620–24. Based on the foregoing, we hold that the trial court erred in awarding Standard appellate attorney's fees.

We sustain this portion of appellants' third issue.[26]

## Conclusion

We reverse the trial court's judgment as to its award of attorney's fees to Standard and remand the cause to the trial court for a new trial limited to the determination of reasonable and necessary trial court and conditional appellate attorney's fees to be awarded to Standard. *See Rohrmoos*, 578 S.W.3d at 506

---

[26] Due to our holdings as to appellants' third issue, we need not address any of appellants' remaining arguments related to that issue. TEX. R. APP. P. 47.1.

(reversing award of attorney's fees because evidence was legally insufficient and remanding to trial court solely for redetermination of attorney's fees); *Westheimer*, 702 S.W.3d at 636; *see also City of Laredo v. Montano*, 414 S.W.3d 731, 736–37 (Tex. 2013) (remanding for recalculation of attorney's fees when evidence of work performed existed but was insufficient to support the amount awarded in judgment). We affirm the remaining portions of the trial court's judgment.


                                          Kristin Guiney
                                          Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.